Gordon, Secretary of Banking, *v.* Continental Casualty Company, Appellant.

556

Argued October 2, 1935.   Before FRAZER, C. J., SCHAFFER, MAXEY, DREW and LINN, JJ.

*Louis J. Wiesen,* with him *Emrys G. Francis* and *Davis, Fruit & Anderson,* for appellant.

*Thomas H. Armstrong,* with him *Guy Thorne, Gerald F. Flood,* Special Deputy Attorney General, and *Charles J. Margiotti,* Attorney General, for appellee.

OPINION BY MR. JUSTICE SCHAFFER, November 25, 1935:

This action was brought by the secretary of banking in possession of the Dollar Title and Trust Company of Sharon to recover from the Continental Casualty Company the amount stipulated to be paid ($50,000) on a "Banker's Blanket Bond" given by it to the trust company conditioned to indemnify the latter against loss due to the dishonesty of the trust company's officers and employees. The court by agreement heard the case without a jury, decided in plaintiff's favor and entered judgment for the amount of the bond, with interest. The defendant appeals.

Appellant urges upon us, as it did upon the trial court, that it is relieved of liability because in procuring the bond Ralph E. Matthews, who was secretary and treasurer of the trust company, perpetrated a fraud upon appellant by falsely representing, in the written application for the bond, which he signed in the trust company's behalf, that no losses had been sustained by it during the preceding five years from any of the causes against which indemnity was to be given, and that there had never come to the notice or knowledge of the trust company any fact or information, indicating that any of its officers were dishonest or unworthy of confidence, whereas, at that very time, he, Matthews, was an embezzler of the trust company's funds to the amount of $26,000.

The court held this defense unavailing because Matthews' information of his own dishonesty was unknown to the trust company, and his knowledge was not imputable to it, since in embezzling the money he was acting adversely to it. For the conclusion reached reliance was placed upon Metropolitan Ins. Co.'s App., 310 Pa. 17, and Thurston v. Assets Realization Co., 58 Pa. Superior Ct. 99.

Incidental to his determination of liability, the trial judge held that the written application for the bond, signed by Matthews as secretary and treasurer of plain-

tiff, in which the false representations were made, was not admissible in evidence, because not attached to the bond, basing this ruling upon section 318 of "The Insurance Company Law" of May 17, 1921, P. L. 682, 40 P. S., section 441, which reads as follows (Italics supplied): "When Application, Constitution, By-Laws, and Rules Are Considered *Part of Policy.—All insurance policies,* issued by stock or mutual *insurance companies* or associations doing business in this State, in which the application of the *insured,* the constitution, by-laws, or other rules of the company form part *of the policy* or contract between the parties thereto, or have any bearing on said contract, shall contain, or have attached to said policies, correct copies of the application as signed by the applicant, or the constitution, by-laws, or other rules referred to; and, unless so attached and accompanying *the policy,* no such application, constitution, or by-laws, or other rules shall be received in evidence in any controversy between the parties to, or interested in, *the policy,* nor shall such application, constitution, by-laws, or other rules be considered a part *of the policy* or contract between such parties."

The argument of appellee's counsel is that because the section speaks of a "policy or contract" issued by an insurance company, while in section 202c there is included among the purposes for which insurance companies may be incorporated that of (1) "Guaranteeing the fidelity of persons holding places of public or private trust; . . . indemnifying banks . . . against the loss of any bills of exchange, notes, drafts, acceptances of drafts, bonds, securities, evidences of debt, deeds, mortgages, documents, currency, and money," any contract for such purpose issued by an insurance company is within the provisions of section 318, with the result that the requirement exists that the application must be attached to the bond if it is to be admissible in evidence. We cannot so interpret the section. It was intended to cover policies or contracts of insurance as commonly understood.

The fact that we have said that the business of surety companies is in all essential parts that of insurance, as in Young v. American Bonding Co., 228 Pa. 373, and that the corporation engaged in furnishing surety bonds for a money consideration is in law an insurance company and must be treated as such in determining questions regarding its liability to the obligees of such bonds (South Phila. State Bank v. National Surety Co., 288 Pa. 300; Mechanics Trust Co. v. Fidelity & Casualty Co., 304 Pa. 526) does not lead to the inevitable conclusion that section 318 was intended to apply to bonds such as the one here in question. A stringent requirement of this character would have to be clearly expressed, and it is difficult to make the language of the section fit such a bond as the one before us. The unmistakable reference of the word "contract" is to insurance policies, and it may be hazarded that no one ever spoke of a fidelity bond as a policy or would be understood as referring to such a writing if he did.

There is no indication throughout the act to use the words "bond" and "policy" interchangeably. Words in a legislative enactment are to be taken in their ordinary and general sense: Com. v. Wark, 301 Pa. 150. The section is substantially a reënactment of the Act of May 11, 1881, P. L. 20, which is entitled "An act relating to life and fire insurance policies." "When the statute under consideration is a general revision, the law as therein written will be deemed to be the same as it stood prior to the revision, unless we find from the statute itself, or its history, a clear intention to change it": Miles's Est., 272 Pa. 329, 339. Moreover, the Act of 1921 (section 412, 40 P. S., section 512) requires written applications for life insurance. The act nowhere requires a written application for a fidelity bond. We are of the opinion that section 318 of the Insurance Company Law does not apply to fidelity bonds, that, therefore, the written application was admissible in evidence, although not at-

tached to the bond, and that the court erred in excluding and not considering it.

This brings us to the main question in the case: Was the plaintiff at the time the bond was applied for visited with notice of Matthews' defalcation through his knowledge of his own dishonesty? Matthews was, as the testimony clearly shows, the chief executive and managing officer of the bank. He was its secretary and treasurer, its highest salaried officer, giving his full time to its business and affairs. The president was not salaried, but was engaged in other business and did not give his full time to plaintiff's affairs. The directors and president had instructed Matthews to procure the bond and had caparisoned him as the bank's representative in doing so. He was held out as its fit instrument to answer truthfully and fairly the queries which the defendant desired information upon to guide it in deciding whether it would assume the obligation to the bank. As our late brother Mr. Justice SIMPSON when the case was here before (311 Pa. 109, 111) clearly stated: "On the faith of [Matthews'] statements in the application, defendant issued the indemnity bond. . . . Plaintiff, being a corporation, could not personally have any knowledge on this subject [the honesty of its officers]; consequently the language quoted [from the application] could only refer to knowledge of the executive officers, directors or stockholders of plaintiff, among the first of which was the secretary-treasurer, who, of course, knew that he was an embezzler, yet was seeking to have defendant guarantee his fidelity, which, presumptively at least, it would not do if the fact of that embezzlement was disclosed."

Under these circumstances, there would seem to be some confusion of thought in the application of the rule that a principal is not visited with notice through an agent where the agent at the time is acting adversely to his principal and where it would be to the interest of the agent not to disclose his action or information to the principal. In procuring the bond Matthews was not act-

ing adversely to the bank, but in its behalf. The adverse act of embezzling the money had been consummated previously; in that transaction—the act of embezzlement—his knowledge of his own dishonesty did not carry through him to the bank, because he was then acting adversely to its interests. In arranging for the bond, however, this was not the case. The distinction between the two situations is made clear by reference to Metropolitan Life Ins. Co.'s App., 310 Pa. 17, relied upon by the court below for its conclusion that Matthews' knowledge of his defalcations was not imputable to the trust company. That case, however, does not rule the situation which this record presents, because in that instance Matthews (the same individual as in this one) was acting fraudulently for his own benefit and adversely to the interests of the bank in the very transaction in which the loss to the Metropolitan Company occurred. The latter endeavored to establish in its favor a trust ex maleficio in the trust company of sums of money which the insurance company had paid to the trust company for certain mortgages sold by the trust company to it. In this it was unsuccessful, for it developed that the money paid by the Metropolitan Company and intended for the mortgagors had been stolen by Matthews; since in misappropriating the money Matthews was acting adversely to the interests of the trust company, it was not visited with notice of that fact, and hence not liable as a trustee ex maleficio.

It is argued by appellant's counsel, and we think convincingly, that the adverse interest exception to the rule that knowledge of a corporate officer is knowledge of the corporation, applies only where a third person seeks to enforce some demand against the corporation (as in the Metropolitan Insurance Company Case), but the exception has no application where the corporation seeks to enforce the benefit of a fraud perpetrated by its officer on a third person; that the exception to the rule of imputed knowledge is not a vehicle for the consummation

of fraud. This is in line with the summing up of the law in the Restatement of the Law of Agency. Section 261 thus enunciates the general rule: "Agent's position enables him to deceive. A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." In the comment on the section this appears: "Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that, from the point of view of the third person, the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Section 282: "Agent acting adversely to principal. (1) A principal is not affected by the knowledge of an agent in a transaction in which the agent is acting adversely to the principal and entirely for his own or another's purposes, except as stated in subsection (2). (2) The principal is affected by the knowledge of an agent although acting adversely to the principal: (a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby; (b) if the agent enters into negotiations within the scope of his powers and the person with whom he deals reasonably believes him to be authorized to conduct the transaction; or (c) if, before he has changed his position, the principal knowingly retains a benefit through the act of the agent which otherwise he would not have received." In the comments on this section, the following is stated: "Meaning of 'acting adversely.' The mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests." The illustration given is this: "A, P's superintendent, knowing that B, a servant working under him, has been stealing

from P, and hoping to share B's gains if P can be prevented from becoming suspicious, applies for and receives a surety bond from T, the bond running to P and guaranteeing B's fidelity. T is not liable to P upon the bond." In the standard textbook on agency, we find the following: "So where the act of the agent is apparently within the terms of an express authority, the principal may be bound, although the agent, unknown to the party dealing with him, is secretly engaged in abusing his authority, or has a secret motive to divert the fund either to personal or other illegitimate ends": Mechem on Agency (2d ed.), volume 2, page 1309. See also page 1311, section 1728.

Analysis of our cases discloses consistent adherence to the distinction here made. Gunster v. Scranton Illuminating Heat & Power Co., 181 Pa. 327, much relied upon by appellee's counsel as sustaining his position, will be seen not to do so when the situation there presented is taken into account. On the contrary, it is directly in line with our decision in the instant case, as an examination of the facts shows. In that case the agent who perpetrated the fraud was acting in a dual capacity as agent of two principals and the controversy was over which one should suffer the consequence of his fraudulent act. In the course of the opinion and speaking generally, it is said (page 335 et seq.): "An exception to the general rule that notice to the agent is notice to the principal, arises in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the agent *acts for himself in his own interest* and adversely to that of the principal. . . . But no agent who is acting *in his own antagonistic interest* or who is about to commit a fraud *by which his principal will be affected* does in fact inform the latter, and any conclusion drawn from a presumption that he has done so is contrary to all experience of human nature. . . . An independent fraud

committed by an agent *on his own account* is beyond the scope of his employment, and bears analogy to a tort wilfully committed by a servant for his own purposes, and not as a means of performing the business entrusted to him by his master." The opinion goes on to state the point on which the case was decided: "Even, therefore, if the present case be made to turn on the question of knowledge it was erroneously decided. But we do not regard knowledge as the pivotal point of the case. Upon that point both parties would stand equal. Both might by mere inference be charged with knowledge, as the fraud was committed by an agent with authority to act for both, but in fact neither had or in the nature of things could have any knowledge at all, and neither was under any obligation to presume that its agent would be guilty of fraud. The real question is, in what capacity did Jessup commit the fraud? And it is clear that it was as treasurer of the appellee. It was as treasurer he presented the notes for discount, and as treasurer he drew the checks for the proceeds. Both acts were within his authority as treasurer and would have been lawful if they had been honest, but he drew the money on drafts which were the property of the company, and when he embezzled the money it was the money of the company. The bank had no part in his act, and gained nothing by it. The fraud had its inception and its consummation in acts done in his capacity as treasurer of the defendant company, and it should bear the loss."

In Bank of Shamokin v. Waynesboro Knitting Co., 314 Pa. 365, 373, in analyzing a situation under which it was contended the adverse interest rule should be applied, we said: "It will be noted that the foundation of the rule of imputed knowledge is 'antagonistic interest,' or the situation where an agent *is about to commit a fraud on his principal.* If neither of these circumstances exist in that the cashier was acting as the only representative of the bank which was transacting business, and his per-

sonal interest was incidental or indirect, the rule does not apply. . . . Graeber acted for the bank, and his knowledge of the defect in the notes is properly imputable to his principal, the bank." A footnote to this opinion points to a line of authorities which establishes the rule that "A corporation shall be held responsible for the knowledge which is possessed by those whom it appoints to represent it. From the nature of its constitution it can have no other knowledge than that of its officers, and, in dealing with such officers, as with the corporation itself, third parties have a right to consider it knows what they know. Indeed, when the presiding officer of a corporation is intrusted with the transaction of its business, with full power to bind the corporation in respect to such business, it seems more proper to call the knowledge which he has actual knowledge of the corporation rather than to say it is imputed." In the above-mentioned case, Citizens Nat. Bank of Greencastle v. Speck, 108 Pa. Superior Ct. 247, is cited. The language there used has much pertinence to the controversy in hand (page 252) : "It is admitted that a fraud was perpetrated on the defendant and the bank by the bank's cashier, yet the plaintiff [the bank] claims the right to avail itself of the fruits of the fraudulent transaction and disavow responsibility for the actions of the one who represented it in the very same matter. . . . The entire management of the bank was intrusted to the cashier, and in this matter he was the sole representative of the bank; in fact, *was* the bank. . . . The board of directors had turned over to the cashier the entire management of the bank; he stood in the place of the directors by reason of a course of practice of which they approved. We are not required to resort to the legal fiction of a constructive notice, but have as specific and actual a notice as if it had been placed in writing and read to the board of directors in meetings regularly assembled. The corporation became possessed of this note

through the act of no other person than the cashier Sheely. The bank was not represented in any stage of the transaction by any one other than its cashier. It must be taken to have known what he knew, and it cannot regain the benefits of his act without accepting the consequences of his knowledge. All the rights that the plaintiff obtained it obtained through Sheely, and it is answerable for his acts." Mundorff v. Wickersham, 63 Pa. 87, 89, rules that, "Where the agent of the insured, in effecting an insurance, makes a false and unauthorized representation, the policy is void. Where one of two innocent persons must suffer by the fraud or negligence of a third, whichever of the two has accredited him, ought to bear the loss. . . . A principal who sues to enforce a contract is bound by the representations made by his agent, in order to induce the opposite party to make it." To the same effect are Jones v. Nat. Bldg. Assn., 94 Pa. 215; Wheeler & Wilson Co. v. Aughey, 144 Pa. 398; DeTurck v. Matz, 180 Pa. 347.

In Thompson on Corporations, volume 3, section 1769, it is said: "Where a principal sends forth his agent to conduct his affairs and contract for his benefit and the agent procures a contract by fraudulent or corrupt practices, although the principal may not have been privy in any way to such conduct of his agent, yet by claiming the benefits of the contract he must take it tainted as it may be by such practice." In the same work (3d ed.), volume 3, section 1778, this appears: "However applicable the dictum that an agent about to commit a fraud will not announce his intention may be in the case of fraud upon his own principal, it has no application when the agent acting in its behalf or ostensibly so commits a fraud upon a third person."

If the rule contended for by the appellee and applied by the court below were to be accepted by us, then the officers of a bank, all of whom were defaulters, could obtain from a bonding company a bond covering their de-

faults and the bank, invoking the adverse interest rule, could reimburse itself for their embezzlements.

Thurston v. Assets Realization Co., 58 Pa. Superior Ct. 99, cited by the court below, has no application to the case in hand. There the fraudulent scheme was for the personal advantage of the treasurer of a trust company and he made the fraudulent representation, not in the interest of the bank, but in order to perpetrate his own individual fraud.

It is contended by appellee that there is no warranty in the bond of the truth of the statement made to the appellant. We think this matter was disposed of in our previous opinion (311 Pa. 109) where we said (page 113) : "Section 8 of the bond says: 'No statement made in the application for this bond *or otherwise submitted* by or in behalf of the insured shall be deemed a warranty of anything except of the fact that the statement is true to the best of the knowledge and belief of the person making it.' The 'person' who made the false statement regarding the past conduct of the employees, whose future integrity defendant was asked to guarantee, was the secretary-treasurer, who, as stated above, had himself previously been an embezzler from plaintiff. Perhaps a fair interpretation of that section, if it stood alone, would be that the 'statement made [by the secretary-treasurer] . . . shall be deemed a warranty . . . of the fact that the statement is true to the best of [his] knowledge and belief.' If so, this warranty was broken as soon as it was made."

We are of the opinion, under the circumstances disclosed by this record, considering the relation which Matthews bore to the bank, that his fraudulent representations to the defendant vitiated the bond.

The judgment is reversed and is here entered for defendant.